IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

JOSEPH J. BROADWAY,                )
                                   )        2017 JUN 20  P 3: 22
        PLAINTIFF,                 )
                                   )        DEBRA P. HACKETT. CLK
                                   )         U.S. DISTRICT COURT
V.                                 )         MIDDLE DISTRICT ALA
                                   )        CASE NO. 2: 17-CV-398-WKW-SRW
                                   )
STATE FARM MUTUAL                  )
AUTOMOBILE INSURANCE               )        JURY TRIAL DEMANDED
COMPANY,                           )
                                   )
        DEFENDANT.                 )

## COMPLAINT

### I. The Parties

1. Joseph J. Broadway (herein after "Joe Broadway" and/or "Plaintiff") is a resident

citizen of Montgomery County, Alabama and is over the age of nineteen.

2. Defendant State Farm Mutual Automobile Insurance Company (herein after "State

Farm" and/or "Defendant") is an Illinois corporation with headquarters at 1 State Farm

PLZ., Bloomington, Il. 61710 and is in the business of selling policies of automobile

insurance throughout the United States including the State of Alabama all times relevant

herein.

### II. Jurisdiction and Venue

3. The court has jurisdiction of this civil action based on the diversity of citizenship of

the parties pursuant to 28 U.S.C. §1332; and all acts complained of occurred in the Middle

District of Alabama.

### III. The Facts

4. On July 10, 2012 Plaintiff Joe Broadway was involved in a motor vehicle accident in the City of Montgomery, Montgomery County, Alabama wherein an individual by the name of Roger D. Channell negligently and/or wantonly ran a red light causing the motor vehicle he was driving to collide with Plaintiff's vehicle causing it to flip over and crash. As a proximate cause and/or result Plaintiff Broadway sustained serious injuries including but not limited to a broken neck (transverse process fracture of the C-6 vertebrae), herniated and bulged disc at his C-4-5, C5-6, and C6-7 levels, a bruised mashed dented spinal cord, cervical radiculitis, severe cervical sprain, strained shoulder, various bruises, contusions and abrasions, medical bills, prescription pharmacy bills, lost income, diminished earning capacity, permanent physical impairment, mental anguish and physical pain and suffering.

5. Prior to said date Plaintiff Joe Broadway had purchased a policy of automobile insurance from Defendant State Farm by and through Defendant Shane Anderson at Defendant Anderson's Montgomery, Montgomery County, Alabama office which included uninsured and underinsured motorist coverage for which Plaintiff paid a valuable consideration, and for which he expected to be treated as a "Good Neighbor" in the event he ever had to make a claim under said policy.

6. Said responsible driver Channell was only insured for liability purposes for the minimal amount required by Alabama State law - $25,000.00, which amount Channell's insurance carrier paid to Plaintiff. Before accepting said policy limits offer Plaintiff via his legal counsel sought and obtained permission to accept those limits and sign a release in favor of Channell and Channell's insurer from Defendant State Farm. And, State Farm

2

contemporaneously made the decision to waive its subrogation right as to Channell in

regards to Plaintiff's claim for underinsured motorist benefits with Defendant, which claim

State Farm was on notice of. State Farm subsequently refused to pay Plaintiff any more than

$5,000.00 for his underinsured motorist claim knowing that the fair and reasonable

settlement value of his claim exceeded the amount of underinsured motorist coverage

available to Plaintiff -$25,000.00.

## PRIOR LITIGATION

7. On July 29, 2013 Joseph Broadway filed a breach of contract and bad faith failure to

pay underinsured motorist benefits claim against State Farm in the Circuit Court of

Montgomery County. State Farm removed that case to the Middle District of Alabama [ 2-

13-cv-00628-WKW-SRW] where litigation ensued over Plaintiff's claim that State Farm

breached its policy of insurance/contract with Joe Broadway and committed various acts of

bad faith respect to his claim for underinsured motorist benefits as of the December

2012/January 2013 time period.

8. On June 26, 2015 Defendants State Farm filed a motion for summary judgment as to

said claims.

9. On August 27, 2015 Plaintiff filed his response in opposition to State Farm's motion

for summary judgment including two thousand pages of evidence.

10. The district court made several reassignments to handle said summary judgment,

and, on May 20, 2016, a Federal judge from Mississippi was assigned the case and on the

same date entered an order granting State Farm's motion for summary judgment ruling that

said claims were "not ripe and premature" <u>as to the December 2012/January 2013 time</u> <u>period</u>. The District Court therefore dismissed the case "<u>without prejudice</u>."

11. Plaintiff Joseph Broadway appealed that dismissal to the Eleventh Circuit Court of Appeals which affirmed that court's decision in an unpublished opinion dated March 28, 2017, without reviewing any of Plaintiff's facts, and on the alleged basis that the bad faith claims pertaining to the original adjustment and handling of this underinsured motorist <u>claim in December 2012 and January 2013</u> were "premature and not ripe."

<u>Both the District Court and the Eleventh Circuit Court made clear that it was only</u> <u>considering Plaintiff's bad faith claim with respect to the 2012 time period and specifically</u> <u>the Plaintiff's claims of bad faith with respect to State Farm that took place in December</u> <u>2012 and January 2013 **and not any subsequent conduct by State Farm**</u> after Broadway filed his lawsuit in July, 2013.

## PRESENT LAWSUIT

12. <u>It is subsequent conduct by State Farm that is the subject of this new, ripe and</u> <u>mature claim of bad faith refusal to pay Mr. Broadway's legitimate underinsured motorist</u> <u>claim</u>. Specifically, in State Farm's letter dated January 18, 2013, wherein it refused to pay anything more than $5,000.00 on Broadway's UIM claim, it stated the following:

> "State Farm® is committed to paying the amount reasonably owed to our insured under the uninsured coverage as soon as practical. To date, we have been unable to agree on an amount.
>
> Your current demand is $25,000.00 and our current offer is $5,000.00. Since it appears we have reached an impasse, we are enclosing our payment for $5,000.00, which constitutes our initial offer.

The remaining coverage available will be reduced by the enclosed advanced payment. This payment will also be credited against any final determination of damages.

This payment should be considered an advance without prejudicing your client's right to receive a higher amount in the future through continued negotiations.

We will continue to evaluate any and all new information you may have that could affect our evaluation.

We hope you will reconsider our last offer to resolve this matter. If you have any questions, please contact us."

Said letter is attached hereto as exhibit A.

13. Beginning on April 15, 2015 and continuing through June 2015 Joseph Broadway provided the Defendant State Farm a massive amount of post 2012 medical records, medical bills, and other physical and economic damages information and proof reflecting continuing and ongoing medical treatments for his severe automobile accident injuries, which had continued throughout 2013, 2014, and 2015; which gross medical bills and other bills totaled over **$105,911.82** and net medical bills and expenses exceeded the amount of the $20,000.00 of underinsured motorist coverage that State Farm refused to pay to Mr. Broadway in December 2012 and January 2013. These productions by Mr. Broadway to State Farm were contained in numerous responses to State Farm's interrogatories and request for production of documents to Mr. Broadway in the first Broadway case (Broadway I) and are identified as Document numbers 122-1 through 124-3 in said court file.

14. In addition, depositions were taken of Plaintiff's four (4) medical providers in June 2015 and all of his medical doctors, from the emergency room physician to his family physician, to his neurosurgeon and pain management physician, testified that all of the

5

injuries and damages sustained by Mr. Broadway were caused by his subject rollover motor vehicle accident of July 10, 2012, and these doctors provided copies of their medical records and bills as said depositions.

15. The following were the facts that were proven by Plaintiff to State Farm during that April 2015 through August 2015 time period including but not limited to the following:

### Testimony of Plaintiff Joseph Broadway

16. The affidavit and deposition of Plaintiff Broadway (deposition taken by State Farm on May 7, 2015; affidavit submitted in opposition to summary judgment on July 27, 2015) unequivocally established that he sustained serious injuries of the permanent nature in the subject rollover motor vehicle crash of July 10, 2012; that Mr. Broadway submitted evidence of same to State Farm from the time of his accident to December 2012; that it is undisputed that the other driver Roger Channell was solely at fault causing the accident; that has he experienced serious and permanent  injuries as a result of the accident including but not limited to a fractured cervical vertebrae, herniated discs, post-concussion syndrome, severe neck sprain, injured shoulder, dented spine, and missed two (2) months of work; works a heavy duty physically demanding labor job as a surveyor which is his main occupation; returned to work before being released to do so from his neurosurgeon Dr. Patrick Ryan because he had to earn money to pay his bills and keep his job, made a claim with the responsible Mr. Channell's insurance company ALFA who quickly and immediately with no contest paid their policy limits of $25,000.00 to Mr. Broadway given the serious nature of his injuries; made a claim for uninsured motorist coverage with State Farm September 13, 2012 and supplied numerous medical records and documentation of his

6

injury including a statement from his physician establishing a permanent physical impairment rating of 4% and an affidavit reflecting that he had been experiencing significant pain continuously every day since the accident which the affidavit also made clear that he has a heavy duty physically demanding job as a surveyor. Mr. Broadway's affidavit further shows that he made repeated demands of his policy limits of available uninsured motorist coverage from State Farm ($25,000.00) that he made clear to State Farm during that 2012 time period that the fair and reasonable settlement value of his claim vastly exceeded the amount of coverage. Despite same State Farm gave Mr. Broadway a $5,000.00 take it or leave it offer.

In doing so State Farm completely ignored medical documentation, the permanent physical impairment rating from Dr. Ryan, and disregarded Mr. Broadway's physical pain and mental anguish, completely disregarded his sworn statement and acted like it was doing Mr. Broadway a favor by giving him $5,000.00.

Mr. Broadway's affidavit further established that subsequent to 2012 including after he filed his first lawsuit against Defendant, that he has continued to endure conscious physical pain and mental anguish subsequent State Farm's December 2012/January 2013 bad faith low ball offer of $5,000.00, including but not limited to continuous medical treatment throughout 2013, 2014 and 2015 (which continues to this date and will never end), having to take daily pain and muscle relaxers prescribed medication in order to function and continue doing his job as a surveyor; had an increase of his physical impairment rating to 18%; had been undergoing pain management treatment for over two (2) years (as of 2015) (4 years as of 2017) including the above mentioned pain and other daily medication but also numerous

7

pain shots in his neck which take place in a surgical operating room setting, his physicians have advised that he needs a radical multi-level surgical discectomy and fusion but there are no guarantees that that surgery will alleviate Mr. Broadway's pain and other symptoms; Mr. Broadway has incurred gross medical bills of $105,911.82 (as of June 2015) and net medical and other expenses <u>subsequent to December 2012/January 2013 in excess of the $20,000.00</u> <u>that State Farm previously refused to pay to him and, State Farm was provided all of this</u> <u>undisputed medical and damages information in April, May, and June 2015 and participated</u> <u>in the four treating physicians depositions in June 2015, but has continued to refuse to pay</u> <u>Mr. Broadway's legitimate insurance claim, or any amount.</u>

During his deposition of <u>May 7, 2015,</u> Mr. Broadway testified: "You know, I got a broke neck, and messed up – everything is messed up here and their trying to throw this pocket change at me and they know good and well it should be well over $25,000.00. It should probably be $100,000.00." (Plaintiff Dep., p.174) Mr. Broadway further testified that: "This is a very serious injury. That is laughable. $5,000.00 is laughable for this injury. There are people with just a little neck strain and stuff. I had a violent whiplash that broke bone in my neck. It is a very serious injury. And to throw $5,000.00, I was disgusted. This was over with then. Ya'll – that was the last check ya'll were going to write. Ya'll wrote that hoping that we wouldn't pursue nothing else." (Plaintiff Dep., p. 178) Further, "You know, here I am, I'm hurting like hell and I'm beat up and everything and ya'll are kicking me on the ground when you should have just wrote a check for the claim and got it over with. Because this is a very serious injury. This is laughable." (Plaintiff Dep., p. 179-180) In addition pursuant to State Farm's repeated questions about placing a dollar figure about his pain and

suffering Mr. Broadway stated, "You know, if you ask me the pain and suffering its, millions of dollars because it hurts like hell." (Plaintiff Dep., p.227) "And I've got to live with it the rest of my life." (Id) He further testified that "I expected full payment of my policy limits is what I expected… Well, I didn't have to ask. My injuries and stuff were so severe, it shouldn't have even been asked. They should have paid it. They should have cut a check for the severe injury and all of the stuff that I went through. ALFA did it." (Plaintiff Dep., p. 232) Plaintiff further testified that in terms of his physical injuries from his July 10, 2012 car wreck that he would value those injuries and pain and suffering "way beyond the $50,000.00 of insurance coverage that was available between ALFA and State Farm." (Plaintiff Dep., p. 251) And the same is true for his mental anguish for car wreck injuries (Id at p.251-252).

17. Despite all of the testimonial and documentary proof that Mr. Broadway had incurred more medical bills, more prescription bills, more medical treatment, had an increased physical impairment rating and needed surgery, etc. State Farm beginning in late June 2015 and continuing has refused in bad faith to pay Mr. Broadway the remaining balance of his $20,000.00 in underinsured motorist coverage – or any part of it at all.

**18. Deposition testimony of State Farm's claims adjuster Deborah Taylor of February 26, 2015.**

Deborah Taylor testified that she had worked with State Farm for sixteen years (Taylor Dep., p. 11), but had only been a bodily injury and uninsured/underinsured motorist adjuster since June 2012 (1 month before Broadway's accident) (Id at p.12) "and was employed at State Farm's Southern Zone" (Id at p.16). She assumed that the just of Mr. Broadway's

lawsuit was that he "not satisfied with the settlement." (Id at p.25) [Indicating that $5,000.00 was a final settlement not an "initial offer"]. She further testified that there was no coverage issue with Mr. Broadway's claim (Id at p. 27). There was coverage (Id at p. 29). State Farm received a copy of the subject accident report (Id at p. 30). And Mr. Broadway's claim was one of her first claims that she was involved in as an adjuster on an underinsured motorist claim with State Farm (Id at p. 31). She admitted that the accident occurred when Roger Channell ran a red light striking Mr. Broadway's vehicle causing it to turn sideways and roll over (Id at p. 32). And that State Farm went through its standard process of determining fault and determined that Mr. Channell was 100% at fault in causing the accident (Id at p. 34, 37-40) and determined that Mr. Broadway was legally entitled to recover damages from Mr. Channell. She further testified that she is trained to go through the process of making a determination of whether a customer is legally entitled to collect damages from either the uninsured or underinsured driver (Id at p.41) that that is a part of adjusting a State Farm customers claim for UIM coverage (Id) and that she is trained to make the determination that the insured is legally entitled to recover damages from an uninsured/underinsured driver (Id at p. 43). Deborah Taylor further testified that after determining that Mr. Broadway was legally entitled to recover damages from Roger Channell that State Farm "did determine an amount" of those damages. (Taylor Dep., at p. 43-44) Based on State Farm determining that Mr. Broadway was legally entitled to recover damages from Roger Channell State Farm ultimately decided to make an offer of uninsured motorist coverage to Mr. Broadway (Id at p.44). [1]She agreed that once State Farm made the determination that Broadway was entitled

---

[1] It should be noted that throughout this line of questioning State Farm's legal counsel was repeatedly objecting arguing

to recover damages from Mr. Channell that it was a matter of accessing and evaluating his bodily injury claim <u>as to what amount of money was fair and reasonable compensation</u> (Id at p. 44-45, 47). State Farm then makes "a determination as to what we're going to offer to the insured" (Id at p.45) [as if there is some kind of disconnect between the concept of fair and reasonable compensation and what State Farm is "going to offer"].

Taylor further testified to State Farm receiving correspondence and medical records and medical bills from Mr. Broadway's counsel which are contained in these electronic claims file (Taylor Dep., p. 56-57); received early information that Mr. Broadway had a shoulder and neck injury, glass throughout his body (Id at p. 58); and that it was a rollover accident (Id at p. 59). State Farm completes a medical treatment calendar to reflect the dates the claimant has received medical treatment (Id at p. 60) but in Mr. Broadway's case it has July and August 2012 <u>but it doesn't have anything for September, October, November or December 2012.</u> (Id at p. 61) State Farm received a letter from Mr. Broadway's counsel informing it of his representation and informing State Farm that Mr. Broadway sustained a fractured neck and a left shoulder injury in the accident (Id at p. 67) and that as of July 16 it had "received claim for a possible UMBI…" (Id at p.69) Ms. Taylor testified that her involvement on the file began July 16, 2012 [but later testimony will show that she did not advise Mr. Broadway of her being the correct adjuster until a November 1, 2012 letter] (Id at p. 70). State Farm received a letter dated September 13, 2012 from Mr. Broadway's counsel wherein it stated that Mr. Broadway would "be pursuing a claim for uninsured

---

that determination of "legally entitled to recover damages" was a "legal conclusion" despite the fact that the testimony clearly showed that the State Farm adjuster was trained to make that determination including fair compensation and that they are trained to do so in their manuals (Training and Procedural Manuals (See E.G. p. 50-51) (See Taylor Dep., p. 50-51)

motorist benefits for Mr. Broadway. In this regard, it is my understanding that the responsible party, Roger Channell, only has minimal coverage of $25,000.00 with ALFA. Given the nature and extent of Mr. Broadway's injuries, which include a fractured vertebrae and a serious shoulder injury, that amount would be inadequate to fully and fairly compensate him for his injuries. At this time I am enclosing the following records and bills that we have." (Id at p. 73-74) And those records included Montgomery Fire Department emergency medical report, emergency room records, a lost wage statement, and a copy of the accident report (Id). State Farm was also notified at that time that Mr. Broadway was under the care of a Montgomery Neurosurgeon Dr. Patrick Ryan and was attending physical therapy (Id). The lost wage statement that it received reflected that Mr. Broadway was unable to work for two (2) months and had lost $6,385.06 of income (Id at p.75-76). Despite being put on notice of a UIM claim September 13, 2012 State Farm without explanation did not open a UIM claim [coded "COL 045"] until December 11, 2012 (Id at p.83-85) and did not set a loss reserve until that date (Id at p. 86-88) [three months][the day before it's lowball offer of $5,000.00]. By letter dated September 19, 2012 State Farm received additional information on behalf of Mr. Broadway (Plaintiff's Exhibit 13) enclosing additional medical records, correspondence that had been sent to ALFA adjuster Dillashaw, a full copy of the emergency room records from Baptist Medical Center East with records reflecting that Mr. Broadway had sustained a "fractured neck and strain injuries to his cervical, thoracic and lumbar regions, as well as a severe shoulder injury." (Id at p. 91-92) The summary of the injuries included fracture of the left C-6 cervical vertebra, reversal of the normal curvature of the cervical region, cervical, thoracic and lumbar strain,

severe should strain, probable mild concussion and soft tissue swelling of the cranium (Id at p. 93). Taylor testified that she would not necessarily consider a fractured cervical vertebra to be a serious injury (Id a p.95) but that a mild concussion is (Id). State Farm received additional correspondence including records dated September 28, 2012 (Plaintiff's Exhibit 16) which included the records of neurosurgeon Dr. Patrick Ryan who diagnosed Mr. Broadway as having a fractured of the C-6 vertebrae, a disc protrusion – a herniation of C-6-7 with bulging discs at C-4-5 and C-5-6, that Mr. Broadway was suffering from cervical radiculitis and para cervical muscle spasms and left shoulder pain (Id at p. 103). Taylor did not know what cervical radiculitis was - she thought it was "the strain" (Id at p. 107) and was not sure that "HNP" referred to a herniated disc (Id at p. 108). Dr. Ryan's records reflected that he (Mr. Broadway) had been ordered not to return to work as of August 27, 2012 for an additional six to eight weeks. Curiously Taylor would not agree that State Farm was obligated to accept a medical doctors no work order – only that it would "recognize" that he was out of work (Id at p. 109-110).

Taylor admitted that State Farm has a duty of good faith and fair dealing with respect to it's customers like Mr. Broadway (Id at p. 111) but would not agree that that duty would include honoring the physicians no work order but only "take it under consideration" (Id at p. 112) but she admitted it would not be in keeping with State Farm's duty of good faith and fair dealing to go back and play doctor and cancel out the doctor's no work order (Id) [it should be noted that eventually that is exactly what State Farm did]. There was also a no work order in the Baptist East records from the ER doctor (Id at p. 114). State Farm was also provided physical therapy records and bills (Plaintiff's Exhibit 18) that had been

13

ordered by Dr. Ryan (Id at p. 117-120). Subsequently Plaintiff again wrote State Farm on

October 22, 2012 (Plaintiff's Exhibit 20) advising State Farm that he was waiting to hear

back from his letters of September 13, and 19, 2012 and requesting who the correct adjuster

was of his UIM claim (Id at p. 121) and Taylor did not know why nobody from State Farm

had advised Mr. Broadway of who the UIM adjuster was. (Id) Mr. Broadway continued to

supply State Farm with letters, demands, medical records and bills (Plaintiff's Exhibits 21,

22, 23) (Id at p.121, 123) and the letter date November 1, 2012 made a demand for policy

limits stating: "as to the above given the very serious nature of Mr. Broadway's injury

(broken neck) which is still not healed, this is clearly going to be a policy limits claim is the

fair settlement value of his injury and damages **will vastly exceed $50,000.00**  that is

available for primary coverage with ALFA plus the $25,000.00 that he has with State Farm.

This is so clear that we are making formal demand for tender of that $25,000.00 at this time

and requesting a waiver of subrogation with respect to ALFA." (Id at p.125-126 and

Plaintiff Exhibit 23) Taylor admitted that Mr. Broadway was acting in accordance with his

policy obligations in requesting the permission to settle with ALFA/Channell and requesting

waiver of subrogation and permission to sign a release (Id at p. 126-129). Mr. Broadway

sent another letter (Plaintiff's Exhibit 24) to State Farm dated November 9, 2012

reconfirming his demand for policy limits and stating "with a broken neck, this demand is

beyond dispute" (Id at p. 132). In a letter dated December 5, 2012, Plaintiff sent another

letter to State Farm which included a sworn statement from Mr. Broadway outlining his

injury and continuing pain symptoms (Plaintiff's Exhibit 26) which Ms. Taylor saw before

she made a decision on Mr. Broadway's file (Id at p. 135) Mr. Broadway's sworn affidavit

14

<u>he states that he has continuous and serious pain in his neck ever since the accident that he</u>

<u>was unable to work for two months, was still really unable to work but has to out of</u>

<u>economic necessity  that he suffers from major neck pain and stiffness, that he works a</u>

<u>physically strenuous job as a land surveyor constantly carrying heavy equipment, goes home</u>

<u>every day in pain and takes pain pills continuously</u> (Id at p.137-139). She admitted that this

is something that State Farm would have to consider pursuant to its duty of good faith

towards Mr. Broadway (Id) State Farm received a letter from Plaintiff's counsel dated

December 11, 2012 (Plaintiff's Exhibit 28) enclosing a statement from Dr. Ryan assigning a

permanent impairment to Mr. Broadway of 4% to his body as a whole because of his

cervical fracture which references that Mr. Broadway was continuing to have pain, stiffness

and decreased movement in his neck (Id at p.142) that letter also renewed a request waiver

of subrogation, permission to accept ALFA's policy limits (Id at p.142-143).

Pertaining to State Farm's claims adjustment procedures, Taylor testified that it completes

an "IER" – Injury Evaluation Report. (Id at p.144-145) It is contained in the electronic

claims file – page 19 (Id). She testified that it is "always changing, revising it" (Id at p.146);

<u>it was not established in Mr. Broadway's case until December 11, 2012</u> (Id at p.147-148)

when State Farm first established the reserve amount (Id). The reserve amount was $6,

540.00 (Id at p.1 50) the reserve eventually went to 0 "once it gets paid because it's not a

reserve anymore." (Id a p.155)

Taylor testified that the Injury Evaluation Report indicated $17,092.61 as the face value

medical bills and lost wages. <u>In the report where it states "total range of value" it was not</u>

<u>filled out or completed</u> (Id at p.163-164) <u>She admitted such a range of value was supposed</u>

15

to be established in the IER but had no explanation as to why it was blank. (Id at p.164). She

claimed that such a range of value "was eventually set" by herself and the team manager but

had no explanation as to why it was not contained in her Injury Evaluation Report (Id)

[Note: as we'll be seeing subsequently from the testimony of Taylor and Shriefer there was

never any establishment of a low to high range of settlement value even though this is

required by State Farm's policy and procedures claims adjustment manuals]. She was asked:

> Q. Well, aren't you supposed to set like a range of value for
> the different items of damages such as, you know, medical
> bills, lost wages and physical pain and suffering and mental
> anguish, and this sort of thing, past as well as future?

> A. Because you don't see it here written down in this spot
> doesn't mean it wasn't done. (Id at p. 166)[Future testimony
> reveals it was never done]

When pressed further Plaintiff points out that he has requested these documents in this

lawsuit for over one a half years and Taylor stated "I don't know. You will have to ask Paul

[Schriefer] when you speak with him." (Id)

Taylor when asked if she was trained as a claims adjuster for State Farm to establish a

range of value for different values of damages she testified "not necessarily different

categories" (Id) [The Automobile Claims Manual and training material does so require].

(See Plaintiff Exhibit 33, 34 and 35) (The Court should pay close attention to pages 167-168

of Taylor's deposition wherein she admitted that "special damages" referred to out of pocket

economic damages such as medical bills and lost income and "general damages" referred to

as physical pain and suffering, mental anguish, disfigurement, scarring, physical

16

impairments, etc.) (Id at p. 167)  And her response was that "we evaluated the claim. It may

not be in this file – this particular file note, but an evaluation was done on this claim." (Id)

[It should be noted that there was no such evaluation completed and this was confirmed not

only by Taylor's testimony but claims manager Schriefer's testimony and the documents

produced by State Farm as representing the full and complete claims file]. In response to the

question as to what State Farm's range of fair settlement value was for Mr. Broadway was

she testified that, "Ultimately it was $5,000.00." and "That was it." (Id at p. 168)  She

cannot remember everything that was discussed with her claims manager in coming up with

that number – Paul Schriefer, but page 19 of the claims file is an entry by Schriefer on

December 12, 2012 which Taylor testified "basically recapped our discussion" concerning

Broadway's claim (Id at p. 168-170). Taylor said it was Schriefer's "final determination."

(Id) The document references "045-CVR" which means claims evaluation report which is

supposedly the bottom of page 19 and the top of page 20 of the electronic claims file (Id)

but Taylor keeps saying "I haven't seen it" but that she hasn't looked for it. (Id at

p.171)[Nothing else has been produced by State Farm in this case] Reading the portion of

the report that does appear on page 19 of the electronic claim file it states:

> "This type of injury typically resolves on it's on without
> any treatment in four to six weeks without any type of
> ongoing pain, since there is no nerve involvement with the
> area of injury."

Taylor admits that Schriefer typed that on the report (Id). And he was specifically

referring to Broadway's fractured cervical vertebrae (Id at p. 172). Taylor admitted that it

was not the medical evidence that had been submitted to State Farm by Mr. Broadway –

17

medical records and Mr. Broadway's sworn affidavit which reflect that he was continuing to have pain problems with his neck from the day of the accident all the way through the submissions to State Farm into December of 2012. (Id at p.172-173) Taylor admitted that she sees that those records and affidavit were not consistent with what Schriefer said in the above statement in his evaluation in the claims file (Id at p. 173).

Concerning Schriefer's negative statements about Broadway's loss of income claim she stated that "We have people that may state out of work a year. But we are not going to say, oh because he stayed out for a year then it's a year." (Id at p. 175)  And the question was then posed that State Farm has to look at what the medical documentation and doctor's orders are in terms of backing up the amount of time that a person was out of work and she responded: "Because I think that what you are saying is, because the doctor said he should be out for X amount of weeks that that's cause – that's the Bible." (Id at p. 176) [Essentially admitting that State Farm does not even accept medical records and medical statements from physicians and sworn statements from its insured's on the validity of a no work order and therfore the compensability of a loss of income claim] She admitted that Mr. Schriefer was questioning Mr. Broadway's neck pain and why should he have any neck pain after four to six weeks. (Id at p.177) In discussing this with Mr. Schriefer she doesn't know if she pointed out to him that Dr. Ryan found a herniated disc at one level, two other bulging discs (Id at p.178) but admits there was no mention of same in Schriefer's claim commentary (Id). She further admitted that in her Injury Evaluation Report there is only a mention of a shoulder problem and fractured neck and nothing else (Id at p.179). No mention of a herniated disc at C-7 or two other bulging discs (Id) no reference of lumbar, thoracic or

cervical strains (Id) and no mention of glass all over in the body, or probable mild concussion, or medical evidence of being dazed (Id at p.180-181).

Taylor could not give a dollar amount that State Farm assigned for Mr. Broadway's future pain and suffering – or anything in the future (Id at p. 182) but that whatever it was it was included in the $30,000.00 (Id). Whatever the amount was for future pain and suffering for the rest of Mr. Broadway's life was included in the $30,000.00. (Id a p.183)

In Mr. Schriefer's claim file entry of December 12, 2012 he also stated:

> "Not sure of the medical necessity to miss six weeks of work,
> as it doesn't appear insured has a physically demanding
> job." (Id at p.184)

When asked why Schriefer would question the medical necessity of Mr. Broadway missing work for six weeks [it was actually eight] Taylor said, "You would have to ask Mr. Schriefer," and that she did not know if she told Mr. Schriefer she disagreed with that evaluation given the medical documentation. (Id at p.185) When Schriefer wrote that "questionable whether his job duties require him to do much more than he does in his normal daily activities," Taylor also said that Mr. Schriefer would have to be asked what he meant by that (Id at p.185-186). When asked wasn't it the responsibility of the claims manager to be familiar of the file she said Schriefer looked at everything (Id at p.186) – including all of the medical records, medical bills, and Mr. Broadway's affidavit and Dr. Ryan's impairment rating (Id at p.186).

In a phone conversation with Mr. Broadway's attorney on December 12, 2012 she doesn't remember telling counsel that State Farm was conditioning waiver of subrogation

and permission of Mr. Broadway to accept policy limits from ALFA on him accepting the

$5,000.00 from State Farm (Id at p.187-188). She doesn't remember making that statement

(Id at p.189). When asked as a State Farm claims adjuster if she has ever told a customer if

she was conditioning their waiver of subrogation on their accepting a sum of money less

than the policy limits with coverage with State Farm Taylor stated that "I've heard of that

being done", and that she has heard of that being done at State Farm (Id at p.189). If that

was done she doesn't know if that would constitute bad faith (Id at p.190-191) and could not

say if that was improper (Id). State Farm received a letter from Broadway's counsel dated

January 14, 2013 (Plaintiff's Exhibit 30) wherein it stated that in the December 12, 2012

conversation with Plaintiff's counsel that Taylor had attempted to condition waiver of

subrogation of the ALFA policy limits on Mr. Broadway accepting State Farm's offer of

$5,000.00 for his underinsured motorist claim (Id at p.192). Taylor never wrote back to

dispute same (Id at p.192-193).

Pertaining to State Farm's policies and procedures for the adjustments of bodily

injuries and uninsured motorist claims – Plaintiff Exhibit 32 is the Automobile Claims

Manual and on BATES stamp page 76 it references "Current Evaluation Range" and also

references "Elements of Recovery" and the terms "Low" and "High" (Id at p.198-199).

Underneath it references past medical bills, future medical bills, past lost wages, future

wage loss, past pain and suffering, future pain and suffering. And then an evaluation range

low and high (Id at p. 199). Taylor admits that those are the elements of recovery for bodily

injury and uninsured motorist claims and that there could be other things for example,

impairment ratings, scars, and disfigurements (Id at p.199-200). There is no completion of

past and future such damages in Mr. Broadway's claim file (Id at p. 201). <u>Ms. Taylor could</u>

<u>not explain where State Farm gets it's evaluations for general damages such as physical pain</u>

<u>and suffering, mental anguish and physical impairment</u> (Id at p.202). In Mr. Broadway's

case <u>Taylor testified that it "was determined based on the specials, which included his lost</u>

<u>wages, his medical bills…"</u> (Id at p.204) [And there is the crux of a major aspect of State

Farm's bad faith is that it only looked at medical bills and loss of income and tried to apply

a multiplier of two and a half times same to determine the settlement value of Mr.

Broadway's case as if he had a minor non-permanent injury]. This is demonstrated as

follows:

> Q: And so, where does State Farm come up with the $30,000.00
>    Number $25,000.00 he got from ALFA—
>
> A: uh-huh (positive response)
>
> Q: On behalf of Roger Channell, and $5,000.00 from State Farm.
>    Where does this number come from?
>
> A: "It was determined based on the specials, which included his loss
>    wages, his medical bills which were in the amount of $5,200.00.
>
>    You know basically we left that – we offered $5,000.00" (Id at p.203-
>    204) [It should be noted that she also said that if State Farm received
>    other information regarding Mr. Broadway's condition that they would
>    have changed that (Id at p.204) and State Farm has received
>    additional information and it has changed nothing]

Taylor further admitted that State Farm has a duty of good faith and fair dealing and

reasonableness with respect to Mr. Broadway's claim. (Id at p.204-205) She couldn't

21

answer what kind of information State Farm would need to pay more money on Mr. Broadway's claim or to pay the policy limits. (Id at p.208)

She could not remember what the range of value was or discussing a range of value with Mr. Schriefer and it's not contained in the claim file or the injury evaluation report. (Id at p.208-209) She doesn't know what number was assigned to the value of the 4% impairment rating from Dr. Ryan, her injury evaluation report is incomplete and the value range is blank. (Id at p. 211—213) State Farm had a duty of good faith to it's own customers to pay attention to the what the medical evidence says that is submitted to it and also had a duty of good faith not to treat a serious injury like a minor injury. (Id at p.221-222) If Mr. Broadway had continued to receive medical treatment and had continued to have neck pain and stiffness ever since December 2012 Taylor could not answer if that State Farm would owe any additional money or policy limits.(Id at p.226-228)

Importantly she admitted that when they made the $5,000.00 offer "I think we weren't aware of the 4% impairment." (Id at p.234) The $5,000.00 offer was a final offer as of December 12, 2012. (Id)

**19. Deposition testimony of claims manager Paul Schriefer of February 26, 2015.**

The other State Farm employee that was involved with the handling of Mr. Broadway's claim was injury team manager Paul Schriefer. He testified in deposition as follows:

Schriefer is an employee of both Defendant State Farm Mutual Automobile Insurance Company and the umbrella State Farm organization – as an auto injury team manager (Schriefer Dep. at p.8). His responsibilities are to train and supervise claim representatives

and claim processors and review their work (Id at p.14). He admitted that State Farm has

training materials that claims managers and claims representatives are supposed to follow

(Id at p.15). There is also an Automobile Claims Manual (Id at p.16). State Farms claims file

on Mr. Broadways claim is 400 pages (Id at p.21). He became involved in Mr. Broadway's

UIM claim sometime in November or early December 2012 (Id at p.24). He agrees with the

accident report completed by the Montgomery Police Department that Roger Channell was

solely at fault and that <u>Mr. Broadway was legally entitled to recover damages from Mr.

Channell</u> (Id at p. 25-26, 27). <u>And therefore he agreed that it became a matter of State Farm

providing a good faith review and analysis of Mr. Broadway's injuries and damages</u> (Id a

p.28). The ACM set forth guidelines for policies and procedures for claim adjusters with

State Farm (Id at p.31) including bodily injury, uninsured/underinsured motorist claims (Id

at p.31). He didn't join the Southern Zone bodily injury unit until June 2012 (Id at p.43).

But before that he had been employed by State Farm as an in house defense attorney (Id at

p.44). In response to being asked how does State Farm make a good faith determination as

to fair and reasonable settlement offers for its own customers when it comes to general

damages, and Schriefer said, "Just based on experience." (Id at p.51); he admitted Deborah

Taylor did not have a lot of experience (Id at p.52). In reviewing the claims manual and

training materials that indicate State Farm adjusters are to establish a low end and high end

of a range of settlement value for various categories of damages Schriefer said that that is

"based on -- the individual experience of claim representative or the team manager..." (Id at

p.53) Surprisingly he stated that he didn't know if a C-6 vertebrae fracture was a serious

injury (Id at p.54).

We can then see from Schriefer's testimony that State Farm has a preference for playing doctor and even overruling doctors and medical records when he states "I think it's certainly a reasonable diagnosis," in response to the medical records pointing out that Mr. Broadway had sustained straightening of the normal cervical curvature in his spine (Id at p.60).

Schriefer further admitted in regards to any degenerative, age related, or other degenerative changes in a person's spine that there is a principle of law that you take the Plaintiff as you find them and that is it no defense that is somebody is old and more easily injured (Id at p.61). [It should be noted that based on State Farm's filings it refuses to be bound by this legal principle which is a part of Alabama law- which is bad faith] Schriefer had no explanation as to why there was no reference in State Farm's electronic claims file injury evaluation to Mr. Broadway to Dr. Patrick Ryan record that stated that Mr. Broadway had disc protrusion/herniation at C6-7 and two bulging discs at C4-5 and C5-6 (Id at p.65, 67). When asked whether the adjuster was supposed to put a range of value in the Injury Evaluation Report, and in Mr. Broadway's IER the "total range of value" was blank, Schriefer's only explanation was that "I don't know why she [Taylor] put what she put in the evaluation or why she didn't put certain things in there." But that it was something State Farm "likes them to do" (Id at p.67).

Schriefer testified that he did the final evaluation which is reflected on page 19 of the electronic claim file on December 12, 2012 and that Taylor's preliminary evaluation was the day before (Id at p.68). Schriefer admitted that State Farm's training material had manuals,

24

required adjusters to establish a current value range on all injury claims but there is no such

range for Mr. Broadway (Id at p.68-69).

The following is Schriefer's entry on the claims file:

> Concerning 045 CVR, the insured was diagnosed with a non-
> displaced vertically oriented fx thru the anterior aspect of
> the left C6 transverse process. There is no indication of any
> nerve compression. This type of injury typically resolves on
> its own w/o any treatment in 4-6 weeks without any type of
> ongoing pain since there in nerve involvement with the area
> of injury. Also, it is likely BC/BS has paid most of insd's out
> of pocket medical expenses. Not sure of the medical
> necessity to miss 6 weeks of work as it doesn't appear
> insd has a physically demanding job; questionable whether
> his job duties require him to do much more than he does
> in his normal daily activities. Should this case proceed to
> trial, I'm not convince a jury would return a verdict greater
> than the OIC's $25K limits, thus my hesitation to buyout the
> OIC. However, in the spirit of compromise, I am willing to
> extend $5K in 045 authority to resolve this claim. Please
> extend $5,000.00 UIM offer to IA. (Plaintiff's Exhibit 5 p.19)

In reference to Schriefer's Claims Evaluation Statement that Mr. Broadway's "type of

injury typically resolves on its own without any treatment in 4-6 weeks without any ongoing

pain...." Schriefer denied that he was using his own medical opinion [Which he is not

qualified to render one] and indicated something very revealing:

> "No. What I am doing is I am trying to forecast what I think a
> jury would ultimately deem the value of this claim." (Id at
> p.69)

Note: And this reveals the reality that not only was Schriefer improperly rejecting the

medical documentation given to him and Mr. Broadway's affidavit, but he was trying to

play doctor to cancel out such information and instead of determining in good faith a fair

25

and reasonable settlement value for Mr. Broadway's claim, it was treating him as an
adversary to be attacked and, State Farm was at that point planning on how it could
minimize Mr. Broadway's damages in front of a jury. This is further demonstrated as
follows:

Schriefer had no explanation as to why he stated that Mr. Broadway's injury typically
resolves in a matter of weeks without any pain when the medical documentation and sworn
statement are the opposite (Id at p.70-71).

In the above captioned evaluation report Schriefer also stated that he was "not sure of
the medical necessity to miss 6 weeks of work, as it doesn't appear insured has a physically
demanding job. Questionable whether his job duties require him to do much more than he
does in his normal daily activities." (Id at p.73) While admitting that the medical
documentation from the emergency room and the neurosurgeon physician clearly stated that
Mr. Broadway had a no work order for the two month time period following his accident
Schriefer testified that "I have some questions about whether I think a jury would consider it
necessary to miss nine weeks of work because of this particular injury." (Id at p.73-74)
When pressed further why he would even question the medical necessity of Mr. Broadway
missing eight weeks of works Schriefer stated that, "Because I think it something a jury
might consider in their evaluation of this claim." (Id at p.73) [Which is contrary to the duty
of good faith to establish a fair and reasonable settlement value, contrary to State Farm's
automobile claims manual and training material]  When asked why a jury in Montgomery
County, Alabama would question Mr. Broadway's injuries and his doctors saying don't
work for eight weeks – "What's there to question" – Schriefer said, "I think people will use

26

their common sense in their own personal experience in how long they might have been out of work or relatives might have been out of work with injuries similar or even more serious. Jury's don't just automatically take the testimony of a Plaintiff's treating physician and give it 100% credit." (Id at p.75) Schriefer went on to state that, "I think there's a very realistic chance that if ever this case is tried, they may discount Mr. Broadway's lost wage claim thinking there is a difference between being – you know, not physically able to work verses not wanting to work." (Id at p.76)

When asked whether he thought Mr. Broadway just didn't want to work for two months Schriefer says, "I don't know that. A jury might come to that conclusion." When asked on what basis – out of thin air? Schriefer said, "Yeah. I think it is a very reasonable and very defensible assumption." (Id at p.76)

When a recent $250,000.00 verdict against State Farm in Montgomery County, Alabama was pointed out that had just recently been returned for a neck injury with no surgery on an uninsured motorist claim Schriefer's response was that, "I am aware of a Defense verdict we got in Morgan County." (Id at p.79)

Schriefer's did not even believe that Mr. Broadway should have received the $25,000.00 from ALFA (Id at p.81-82).

Mr. Schriefer's Claim Evaluation stated, "It doesn't appear that the insured has a physically demanding job." Which is contrary to Plaintiff's affidavit submitted to State Farm in support of his claim. (Id at p.84) Schriefer did not have a direct response to Plaintiff's question whether State Farm considered what Mr. Broadway described in his affidavit about his surveyor job as being a physically demanding job. (Id at p.85) He never

27

requested Deborah Taylor to go look at the dictionary of occupational titles to look up the

description in details of what a land surveyors job was (Id at p.85-86).  <u>When asked where

he got this from-- that it was "questionable" about Mr. Broadway's job "did not involve

anything physically demanding" Schriefer said, "Just common knowledge and experience."

When pressed further whether he was an expert on what a land surveyor does his only

answer was "Everything is relative and comparative."</u> (Id at p.86)

 <u>Concerning Dr. Ryan's assignment impairment rating of 4% - Schriefer admitted that,

"I don't have a specific dollar value for that" and then basically went on to belittling and

disregarding the rating</u>. (Id)

 <u>Concerning future pain and suffering - Schriefer did not use State Farm's Automobile

Claims Manual format to assign a specific dollar for future pain and suffering, and future

mental anguish, etc. – ("I don't use their format….")</u> (Id at p.90) <u>Rather everything he did

was in his head</u>. (Id at p.91)

 Unbelievably Schriefer had the following response to the following question:

> Q: Would you agree with me that the duty of good faith
> and fair dealing to your State Farm customer includes
> not contradict—not adjusting a claim based on contradicting
> what the medical records clearly state?  Would you agree
> with that?
>
> A: No, I can't agree with that statement. (Id at p.93)

He also testified:

> Q: Would you agree with me that State Farm's duty of good
> faith and fair dealing towards Mr. Broadway includes
> believing what he swears to in an affidavit when it is
> perfectly consistent with what the medical records say?

A: No. I would disagree with that. (Id at p.94)

Concerning whether Plaintiff had itemized categories of damages in his demands for his policy limits Schriefer admitted that Mr. Broadway had made clear to State Farm that he considered his claim to be a policy limits claim (Plaintiff's Exhibit 23) and that the reasonable settlement value of Mr. Broadway's claim was easily in the low to mid six figure range and therefore there should not be a dispute about paying the $25,000.00 limits. (Id at p.104)

**20. Plaintiff's Answers to State Farm's Interrogatories and Document Requests**

On March 13, 2015, over one and a half years after Mr. Broadway's first lawsuit was filed, State Farm for the first time asked Mr. Broadway to provide information about his insurance claim, injuries and damages when it submitted Interrogatories and Request for Production of Documents to him. Plaintiff submitted initial responses to Defendant's discovery on April 14, 2015 which included a massive production of documents involving BATES stamped Pltf.JB000001-Pltf.JB000349. These interrogatory answers and document production responses demonstrated to State Farm that Mr. Broadway had continued to experience daily physical pain and problems associated with his automobile accident injuries and had incurred substantially more medical bills (more than the unpaid UIM coverage), had been given an increased impairment rating to 18%, had been undergoing pain management therapy for two years involving daily pain and muscle relaxers and other medication as well as pain shots in his cervical spine and neck, and that State Farm claims evaluation of 2012 was plain wrong in that Mr. Broadway's injuries were not just serious but

29

were also permanent, he did not "satisfactorily recover", had increased physical impairments and did need surgery.

Plaintiff provided State Farm updated and signed responses on May 5, 2015 and supplements on May 8, 2015 including BATES stamped documents Pltf.JB.000351-Pltf.JB.000411 and Pltf.JB.000527.

Plaintiff was deposed by State Farm on May 7, 2015 and gave extensive testimony about his continuing pain and medical treatment.

Plaintiff provided a Second Amended Response to State Farm's discovery on June 4, 2015 which contained an updated summary of the post December 2012/January 2013 medical treatment caused by the subject accident which demonstrated gross medical bills of $103,762.11; prescription medication bills of $2,666.50; net real life medical and prescription bills of $18,058.38 and total special out of pocket economic damages of $20,526.00- all subsequent to December 2012/January 2013, for which Plaintiff demanded State Farm to pay him the balance of his UIM coverage.

Despite receiving all of this information State Farm in bad faith still did not pay Mr. Broadway's claim or any additional amount after receiving the itemization of Plaintiff's damages in June 2015, receiving all of the medical records of 2013, 2014 and 2015 medical treatment and bills, and participating in four (4) doctor depositions. Instead, State Farm filed a motion for summary judgment on June 26, 2015 as to Broadway's claim of bad faith pertaining to the December 2012/January 2013 time period, and ignored the 2015 submissions of aforesaid records and bills and testimony and refused to pay his secondary 2015 claim for additional UIM coverage in bad faith.

In Plaintiff's first lawsuit (Broadway I) Plaintiff's physicians testified as follows:

**21. Deposition testimony of Dr. Wallace Falero of June 16, 2015.**

Dr. Wallace Falero was an emergency room physician for thirty five years, and is licensed to practice medicine in Alabama. (Falero dep. at p.6-8)

Dr. Wallace Falero was the emergency room physician at Baptist East Medical Center where Mr. Broadway presented himself after the subject motor vehicle accident at 9:30 a.m. (Falero Dep. at p.6, 9) Mr. Broadway had complaints of pain in his chest, upper, mid and lower back, left shoulder and neck, and the nurse had applied a cervical collar. (Id at p.10-12) Dr. Falero described Mr. Broadway's rollover crash as an "abrupt, high energy" crash; he found Mr. Broadway to have muscle spasm, tenderness on both sides of his neck and mid back (Id a p.10-11) and a reversal of the normal curvature his neck which reflected muscle spasms. (Id at p.16-17) He had diagnosed Mr. Broadway as having a fracture of his left transverse process C-6 vertebrae (Id at p.17). He testified that it would take a "high energy blunt trauma" to cause that type of fracture. (Id at p.18) He diagnosed Mr. Broadway as having a strained cervical, thoracic, and lumbar spine caused by a motor vehicle accident as well as a fracture of his C-6 vertebrae also caused by the accident. (Id at p.22) These were all new injuries and Dr. Falero testified that they were caused by the motor vehicle accident. (Id at p.23)

He further testified that dizziness, loss of balance, concentration problems, and memory loss are consistent with what is known as post- concussion syndrome. (Id at p.24)[It should be noted that Mr. Broadway later had such symptoms] And he elaborated that in high energy blunt trauma the brain moves very fast back and forth basically hitting the inside of

31

the skull and there is not always a radiological findings of same but the patient will develop

certain symptoms they did not have before such as memory problems, nausea, vomiting,

blurred vision, concentration problems, etc. (Id at p.25-26) He explained that cervical strain

involves the stretching and tearing of muscles and tendons of the necks. (Id at p.27) And

that Mr. Broadway had probable tearing of his neck muscles. (Id at p.27-28) <u>Testified that</u>

<u>all emergency room bills were all reasonable and necessary and were caused by the motor</u>

<u>vehicle accident</u> (Id at p.27-31<u>) and that he had provided Mr. Broadway a no work order</u>

<u>which was medically necessary</u> (Id at p.31-32) <u>and instructed Mr. Broadway to follow up</u>

<u>with a neurosurgeon because of the cervical fracture.</u> (Id)

He prescribed pain medications which included Hydromorphone to Mr. Broadway. (Id at p.33)

In regards to cervical CAT scan they found arthritic changes in Mr. Broadway's neck. Dr. Falero stated that when a person has no pain or symptoms involving a neck that has arthritic changes that a subsequent high energy motor vehicle accident can cause that latent condition to become symptomatic and permanently symptomatic which is "not uncommon." (Id at p.35-38)

**22. Deposition testimony of Dr. Steven Holmes of June 8, 2015.**

Dr. Steven Holmes testified that he is a general practice and occupational doctor since 1989 (Holmes dep. at p.9-10). Since 1999 his practice has been in Gonzales, Louisiana (Id) and since 2005 he has been the primary care physician for Mr. Broadway. (Id at p.11) As Mr. Broadway's primary physician he is the person that is most familiar with Mr. Broadway's overall medical and health conditions (Id at p.12) Between 2005 and 2010 – a

half decade Mr. Broadway never had any problems with pain or other problems in his neck or shoulder. (Id at p.13)

In an office visit February 21, 2011, Mr. Broadway reported tingling in his left shoulder and arm but no neck pain, no weakness or trauma. (Id at p.17) (See also Plaintiff's Exhibit 37 office note dated 2-21-11) He diagnosed Mr. Broadway as having a cervical pinched nerve with left arm radicular symptoms. (Id at p.19) He referred Mr. Broadway to see a pain doctor in Montgomery and ended up being a Dr. Katz (Id at p.21). Mr. Broadway next saw Dr. Holmes May 13, 2011 and reported that he received two cervical injections and he was better and had less tingling in his arms and his main complaint was he had muscle cramps unrelated to left arm tingling [Holmes testimony is that Mr. Broadway has thyroid and adrenal gland condition which causes cramps] Holmes testified that from May, 2011 forward until after his motor vehicle accident, Mr. Broadway did not complain of any problems with his neck or shoulder.(Id at p.23) In an office visit with Dr. Holmes, July 26, 2012, Mr. Broadway reported that he had been involved in a motor vehicle accident where he was "hit by a person running a red light and his truck rolled and slid. Saw ER and a spine doctor in Alabama, and told he had a vertebrae in the neck fracture. Has complained of neck and left shoulder pain. In physical therapy two times per week and that's helping some. Off work. Due to follow his orthopedic in five weeks." (Id at p.24) So Mr. Broadway had no arm pain reported from May 2011 until after the car wreck reported to occur after July 10, 2012. (Id at p.24)

Holmes further testified that all the years that he had known Mr. Broadway going back to 2005 he found Mr. Broadway to be a honest and trustworthy patient. (Id at p.34)(Id at

33

p.71-72) Mr. Broadway has had ongoing neck pain since the accident and has consistently reported this to Dr. Holmes. (Id at p.73) He testified that there is no doubt that the car crash caused him to have a fractured vertebra in the neck. (Id at p.74) And that he had reversal of the normal curvature of the neck which is evidence of a neck whiplash type of injury causing muscle spasms. (Id at p.75) Dr. Holmes testified that a fractured vertebra reflects serious physical trauma to the neck structure. (Id at p.78) Dr. Holmes reiterated that Mr. Broadway did not have any reported neck pain before his motor vehicle accident only arm pain, one time for a few months long before. (Id at p.81)

### 23. Deposition testimony of Dr. Patrick Ryan of June 19, 2015

Dr. Patrick Ryan testified he has been a Montgomery, Alabama neurosurgeon since 1988, licensed to practice medicine in Alabama and is board certified is neurosurgery which deals with disorders of the brain, spine, and the peripheral nervous system etc. (Ryan dep. at p.9-10) He saw Joseph Broadway as a patient on July 16, 2012 who was referred to him from the emergency room of Baptist East (Id at p.11) because of a motor vehicle accident, wherein he had neck pain, pain on the left side of his neck radiating onto his left shoulder and shocking type sensations into his left should. (Id at p.12) A MRI scan showed a bulging disc at C4-5, C5-6, and a disc protrusion/herniation at C6-7. Mr. Broadway also had muscle spasms in his spine and his neck. (Id at p.13) He was 51 years old at the time and he was a surveyor. (Id) After reviewing the accident report and the photographs of Mr. Broadways truck post- accident Dr. Ryan testified that the report and photos were consistent with what Mr. Broadway described as they kind of automobile crash he was involved in. (Id at p.15) He testified that the accident caused Broadways cervical fracture; caused cervical radiculitis

34

which means inflammation or irritation of the cervical nerves that come out of the neck and go into the shoulder and the arms. (Id at p.15-16) [Which is the opposite of Paul Schriefer's p.19 claims statements] And that the cause of Broadway's cervical radiculitis was his car accident. (Id at p.16) Ryan further testified that his July 16, 2012 cervical MRI reflected a worsened disc at C-6-7 (in comparison to an early February 2011 MRI that Dr. Holmes had done) and now was more of a protrusion and herniation – but that "even more concerning to me was an area of myelomalacia at C4-5 which is a white spot that we see on the spinal cord, and it is consistent with a swelling, bruising injury to the spinal cord. So it tells me that something had happened." (Id at p.18-19) Dr. Ryan's opinion was that Broadway's car accident more probably than not, caused the myelomalacia on his spinal cord. (Id at p.19) Dr. Ryan stated that this was significant because the injury was significant enough to cause myelomalacia of the spinal cord as well as a cervical fracture "that there was enough force we also could have bruised or injured nerves as a result of the compression and the stenosis that was there." Dr. Ryan's opinion is that Broadway's motor vehicle rollover crash of July 10, 2012 was the cause of myelomalacia spine injury. (Id at p.20) Pertaining to the C-6-7 protrusion/herniation, Dr. Ryan testified that it was "most likely" was caused by the accident. (Id at p.22) Dr. Ryan's initially first course of treatment was conservative -muscle relaxers, pain medicines to relieve Broadway's pain and physical therapy in a soft collar. (Id at p.23)

He further testified that he ordered Mr. Broadway to be off work and that it was medically necessary and medically reasonable to restrict Mr. Broadway from returning to work. (Id at p.23-24) The referral to physical therapy was reasonable and medically

35

necessary. (Id at p.24) As of August 27, 2012 Mr. Broadway was order to continue not to
return to work and was going to wait another six to eight week to make that decision. (Id at
p.25) Broadway returned on August 10, 2012 and he had already returned to work on his
own. (Id at p.25-26) He still had pain, edema, and swelling in his neck. (Id at p.26) Mr.
Broadway told him that he had needed to go back to work but "may not have been quite
ready." (Id at p.27) When patients do that it is usually "for financial reasons." The muscle
relaxers and pain medicines he prescribed are reasonably and medically necessary for Mr.
Broadway's condition. (Id at p.28) In Plaintiff's Exhibit 45 he provided a statement dated
December 3, 2012 for Mr. Broadway reflecting the accident caused the cervical fracture,
Broadway was still having continued pain and was expected to have pain into the near
future and required treatment such as physical therapy and medications and assigned Mr.
Broadway a 4% impairment rating to the body as a whole. (Id at p.29) The 4% rating was a
permanent rating, per AMA guidelines. (Id at p.30) Broadway reported having difficulty
with his job so Ryan explained strenuous work particularly involving shoulders and neck the
muscles are constantly pulling on the cervical fracture which takes it much longer to heal
and can be painful. (Id at p.32) Ryan did a subsequent MRI on April 2013 on Mr. Broadway
and the C4-5 level "looked a little bit worse" so he referred Mr. Broadway for cervical
epidural injections with Dr. Herrick who is a pain management doctor. (Id at p.33-34) This
reflected "we can see it as progression from an injury." (Id at p.35) The kind of symptoms
he would expect from this condition would be "any of the things he was having: neck pain,
shoulder pain and arm pain." (Id at p.35) He eventually referred Mr. Broadway for pain
management which was June 12, 2013. He was no better. He discussed surgery with Mr.

36

Broadway and left the decision for surgery with Mr. Broadway. (Id at p.35) Ryan testified

that surgery would involve anterior cervical discectomy and fusion. (Id at p.36) Surgery has

risks. (Id at p.37) The only issue was whether Mr. Broadway was willing to risk that

surgery. (Id) Surgery charges would be in the range of $35,000.00. (Id at p.38) If he had the

surgery his impairment rating would increase to 9%. (Id at p.39)

There was evidence that Mr. Broadway had nerve compression as a result of his

automobile accident injuries. (Id at p.39) In regards to the disc bulges he saw some

compression and flattening of the spinal cord which he saw on MRI. (Id at p.40) He was

also asked:

> Q: If someone were to say that C-6 vertebrae fracture just
> typically resolves on its own without any treatment in 4-6
> weeks without any type of ongoing pain, what would be
> your medical response to that?

> A: Well, that would be someone who doesn't have a clue
> what they are talking about. I can't believe a physician would
> say that. (Id at p.40)

> Q: And if someone were to say that it was not medically
> necessary for Mr. Broadway to miss two months of work
> based on his car wreck injuries, what would be your opinion
> on that?

> A: I would have to disagree with that.

> Q: And why would you disagree with that?

> A: Again, these are painful conditions. And you've got
> someone who is a surveyor, which is not an easy job. It's
> going to be, number one, very difficult to do. Number two,
> he is taking pain medicine; and you know accuracy as a

37

surveyor and the ability to clearly think is key. So, you've got someone in pain taking pain medicines. I just—I would just have to disagree with—with that. (Id at p.40-41)

Note: The above testimony is a direct refutation of Paul Schriefer's injury evaluation and decision making with regards to Mr. Broadway that is quoted above. [Page 19 of State Farm's electronic claims file] (Plaintiff's Exhibit 5)

Dr. Ryan's charges for care and treatment for Mr. Broadway were fair and reasonable and medically necessary. (Id at p.42)  If Mr. Broadway does not have surgery his future prognosis in terms of pain discomfort and disability is that it will continue is that he will continue to have pain and he will have difficulty doing his job. (Id at p.44)

Dr. Ryan also stated that the November 26, 2012 x-ray did not reflect a healed cervical fracture as an x-ray would not show a transverse process fracture. (Id at p.71)

Note: This is again contradictory of Paul Schriefer's decision making process with respect to Mr. Broadway's claim and his comments made at page 19  of the electronic claim file which there was no confirmed healing of that fracture until a June 6, 2013 CAT scan (Id at p.78-79)

In reference to certain phraseology contained within his office visit notes for Mr. Broadway's such as "slowly improving, healing, relatively well" that is not saying that there isn't anything wrong with the patient   - if there was  nothing wrong with the patient he would not be seeing the patient – and those phrases don't mean anything except to himself. (Id at p.84) Clearly Mr. Broadway was still having pain symptomology in his neck and various radiculitis symptomology in his arm and shoulder "all of the time I saw him." (Id at

p.85) He testified that the fracture was either going or most likely going to eventually heal but the biggest issue is that he had had an accident significant enough to break a bone and that involves the soft tissue injuries and the effects on the discs that were already bulging because of age related degenerative changes. (Id at p.86); His opinion that in addition to the new injuries Mr. Broadway's motor vehicle accident also caused age related degenerative conditions in his cervical spine to become exacerbated and become symptomatic (Id at p.89-90); that the fracture was a completely new injury as was the spraining and tearing of muscles and ligaments in his neck. (Id at p.90) "You can't – you don't fracture a bone without the associated soft tissue injury. You did something significant enough to fracture a part of the cervical vertebrae." (Id) Ryan confirmed that Mr. Broadway's soft tissues like muscles, ligaments, and tendons had been affected by the accident because there was something significant enough force to fracture a bone and "you can't do that without an associated injury to the soft tissue." (Id at p.90-91) He also stated that the C4-5 myelomalacia (bruising of the spine) was "most likely caused and more probably than not caused by the accident." (Id at p.94)

**24. Deposition testimony of Dr. Arnold Feldman of June 22, 2015.**

Dr. Arnold Feldman testified that he is an anesthesiologist and pain management specialist located in Baton Rouge, Louisiana and has practiced in that area of medicine since 1983 having attended the Medical College of Pennsylvania and completed residency at Harvard University. (Feldman dep. at 9-10) He is licensed to practice medicine in Alabama, Louisiana, Mississippi, and California. (Id at p.12) He first saw Mr. Broadway for pain management problems in May 2013. (Id at p.13-14) The history was that Mr. Broadway had

39

a car accident in July 2012 and had persistent pain ever since. (Id at p.15) He did some cervical injections for the persistent pain. (Id at p.16) Mr. Broadway had been offered surgical options but wished to pursue pain management options in order to lessen, alleviate, and reduce the severity of his discomfort. (Id at p.17) Mr. Broadway's neck pain was there all the time. (Id at p.19) He had the normal characteristics of aging present in his spine. He did a CAT scan and found a fracture of the C-6 vertebral body – a bony fracture where a chip of bone had come of the vertebral body "and so, some significant trauma would have to have occurred to have cause that." (Id at p.20) Fracture of the cervical spine is no trivial event and is not to be taken lightly by anyone and you have to look seriously into how it occurred because it is not a common event. (He had only seen four in his entire medical practice and they were all quadriplegics) (Id at p.22) There was a significant amount of trauma imported into the occupant of the vehicle and in this case it was Mr. Broadway (Id at p.23) for a fracture of a vertebral body to cause a significant amount of damage to other structures. (Id at p.23) He had a ventral indentation of the spinal cord. (Id at 24) Mr. Broadway fortunately was not killed and went a year with complaints of pain and was seeking consultation to reduce the pain, he was working and did not wish to have surgery because he was afraid of surgery. (Id at p.25) He was seeking relief from pain because it was so painful and he wanted to the pain to be reduced to so he could continue to work and try to earn a living. (Id at p.26) The cause of his pain to his neck and left shoulder was a significant motor vehicle accident. (Id at p.26-27) If anybody at State Farm says that Mr. Broadway has pain because of degenerative conditions Dr. Feldman stated that everybody over 40 has some type of degenerative disc disease but not everybody over 40 has persistent

40

neck pain. Mr. Broadway's spine was normal for a patient for his age. (Id at p.28-29) He would disagree with the assertion that just because the man is 53 years old and has some arthritis of the spine that is guaranteed that he will have neck pain. (Id) Looking at the photos of Mr. Broadway's truck he testified that the type of force that he sees in the picture had to be severe in order to crush the roof and those forces goes somewhere and some of those forces goes to the occupants of the car and some of it went to the C-6 vertebral body of Mr. Broadway and fractured it. "And some of the forces have to go to the soft tissue meaning the muscles, ligaments, and more importantly - - well most importantly, the nerves." (Id at p.30-31) So when the nerves of the spine that  have normal changes due to age they are less apt to accept forces than the forces are more likely to either be long lasting or permanent when applied to an older spine. (Id) "The old – the older spine makes the patient more prone to injury when an unfortunate accident occurs." (Id at p.31) And in his opinion that is the case with Mr. Broadway. (Id at p.31-32) The condition of Mr. Broadway's spine based on MRI's and CAT scans show that he was more likely to sustain spinal injury when a force was applied to his spine. (Id) Because of arthritic changes in his spine, Mr. Broadway was more prone to spinal injury than if it was a younger occupant of the vehicle. (Id at p.37) If there is bony damage done to the vertebrae which happened to Mr. Broadway then there would have to be muscle, ligament damage so Mr. Broadway had significant damage causing ongoing pain and discomfort including cervicalgia- painful neck. (Id at p.40) Cervicalgia is chronic neck pain; he had positive objective anatomical findings on CT, X-ray, and MRI pertaining to Mr. Broadway's symptoms – he saw physical and anatomical reasons for Mr. Broadway's pain. (Id at p.41-42) Based on the anatomical

41

findings he could see why Mr. Broadway complained of pain "by object of reasons." (Id at

p.43) In terms of causation he again testified that, "I believe that causation, based on this

patient's complaint—the temporal considerations, meaning when the accident occurred and

how his—and how his pain was ongoing, was proximately related to the accident in

question." (Id at p.44)

Dr. Feldman further testified that surgery was an option for Mr. Broadway but there

was no guarantee for success to Mr. Broadway was looking at a three or four level cervical

fusion which would make his spine immobile which "would essentially eliminate all the

reasonable motion of his neck. Probably would make him – make it very difficult for him to

work and earn a living." (Id at p.45-46) So he offered pain management therapy to Mr.

Broadway in terms of cervical injections to reduce pain which he could do three or four

times a year and also medication therapy involving narcotic analgesics. (Id at p.47-48) This

therapy doesn't change the underlying condition it only lessens the pain. (Id) So Mr.

Broadway was "basically stuck with injections intermittently, a small dose of narcotics

analgesic, frequent doctor visits, and a small dose of anti-inflammatory medication and

occasionally—muscle relaxer." (Id at p.49) He was going to have ongoing pain and ongoing

loss time from work. (Id at p.51) Beginning the summer of 2013 he did various cervical

injections on Mr. Broadway which continued to the present time. (Id at p.51-53) They help

with pain relief on Mr. Broadway but they are not permanent they only last one to three

months. (Id) Broadway is still his patient and his current medications is Tramadol, muscle

relaxers, hydrocodone, and Lyrica for pain management. (Id at p.54-55) All of the pain

medications that he prescribed are reasonable and medically necessary for Mr. Broadway;

42

and the pain management injections are also reasonable and medically necessary to treat the pain symptoms that Mr. Broadway was having. (Id at p.55) He does pain injections in a formal operating room.(Id at p.56)  Plaintiff's exhibits 54, 55, and 56 are copies of his medical bills and bills from his surgery center which reflect gross bills, insurance payments, and patient payments and balance. And, all of his charges for the care and treatment of Mr. Broadway are reasonable and medically necessary. (Id at p.63-64) The charges for the surgery center bills for the injections are reasonable and medically necessary. (Id at p.65-66)

Dr. Feldman further testified that as of April 12, 2014 he assigned a disability rating to Mr. Broadway of 18% to the body as a whole. Mr. Broadway was in a significant amount of pain and was basically very difficult for him to continue working but he wanted to continue to work. (Id at p.71-72) That 18% impairment to the body as a whole based on automobile accident injuries to Mr. Broadway's neck is still to his opinion today including the opinion that if he has surgery he will most likely be totally disabled. (Id at p.72) In terms of surgery Mr. Broadway would need at least three levels to be addressed surgically (Id at p.72) and this would involve inserting a metal rod plates in the bone graft which would render the cervical spine immobile and it would be unlikely that he could continue doing his surveyor job. (Id at p.73-74) He further testified that chronic long term pain has an impact on the person emotionally, the person has to take medication that could affect their jobs, medication has side effects including constipation, causes sleep deprivation, possibly family and financial problems, so it is better to treat the pain than not treat the pain. (Id at p.75-76)

He has read a portion of Paul Schriefer's statement from State Farm's claim file (p.19) (pertaining to a C-6 fracture healing on its own without pain) and was asked what his opinion about that was and he testified as follows:

"If you look at the distance between the nerve and the artery of the C-6 level there is 2mm of distance. So Mr. Broadway had a force applied enough to break this bone off that has got to impact the structures. It has to. And so -- the statement that you read for me, and-- and I asked you because I didn't want to insult my colleague [assuming it was made by an incompetent doctor], is overly simplistic, is misleading, and is not characteristic of what actually happened. The only thing that is accurate of about that statement is that, yes, you do not have to go in and treat this fracture. Thank goodness. Because if you did, you would have a paralyzed patient." (Id at p.78-79)

Dr. Feldman further testified that the force applied to break Mr. Broadway's cervical vertebrae impacted the neck structures just like they impacted the vehicle enough to cause a fracture of the C-6 vertebrae "and this patient is now stuck with permanent disability as a result of this accident." (Id at p.79-80)

Dr. Feldman's prognosis for Mr. Broadway was that he will have ongoing pain, medication and intermittent injections three or four times yearly (Id at 80) which would require trips to the doctor and if he decided to have surgery it would be an uncertain outcome. (Id at p.81-82)

> Q: Okay. So, with this neck, you would anticipate that Mr.
> Broadway would need, if not the surgery, pain management
> and-which would include so many injections per year
> and pain medication pretty much for the rest of his life?

44

A: Yes. (Id at p.83)

Dr. Feldman confirmed that Mr. Broadway had no prior history of neck pain or neck problems before the accident. (Id at p.118) He also testified that just because there may have been an eventual bone re-mineralization of Mr. Broadway's C-6 fracture that that did not mean that his neck in general including the soft tissues, nerves, etc. had healed. (Id at p.118, 120-121) [again opposite of Schriefer's p.19 Claims File statements] He knows a surveyor is not a light duty job because he sees surveyors in construction in the area. (Id at p.122).

25. In **March and April 2015**, State Farm issued non-party subpoenas to all of Mr. Broadway's medical providers that were the subject of his claim for underinsured motorist coverage (as well as medical information that was not the subject of this claim) and independently obtained all of said records, bills and information in **April, May, and June, 2015 from Broadway's medical providers and participated in four medical doctor depositions in June 2015, wherein all of the medical records of those doctors were analyzed, discussed and explained by said doctors and which were made exhibits to said depositions.**

## IV. Count One: Breach of Contract: Failure to Pay Underinsured Motorist Coverage

26. Plaintiff incorporates by reference paragraphs 1-25 above as if more fully set forth herein and further avers as follows:

27. Plaintiff Broadway paid Defendant State Farm a valuable consideration for automobile insurance coverage including underinsured motorist benefits and satisfied all

conditions precedent to said contract and payment by State Farm of the full amount of said benefits, namely $25,000.00.

28. Defendant State Farm breached said contract by refusing to pay Plaintiff the full amount of said benefits in 2015, 2016 and 2017 and continuing to the present date after Broadway submitted more evidence of medical treatment and medical bills to State Farm in 2015 and proved his injuries were permanent, serious, and continuing, and caused by the subject motor vehicle accident.

29. As a proximate result of Defendant State Farm's breach of contract Plaintiff was caused injury and damage including but not limited to receiving the benefit of his bargain.

Wherefore premises considered Plaintiff demands judgment against Defendant for the full amount of the remaining available underinsured motorist coverage - $20,000.00, plus interest and costs.


## V. Count Two: Claim for Underinsured Motorist Benefits

30. Plaintiff Joe Broadway incorporates by reference paragraphs 1-29 above as if more fully set forth herein and further avers as follows:

31. Broadway again claims his underinsured motorist benefits from State Farm pursuant to his aforesaid policy of insurance that was in force and effect on the date of the subject accident.

Wherefore premises considered Plaintiff demands judgment against Defendant for the full amount of his available uninsured motorist coverage - $20,000.00 plus interest and costs.

## VI. Count Three: Bad Faith Breach of Contract

32. Plaintiff Joe Broadway incorporates by reference paragraphs 1-31 above as if more fully set forth herein and further avers as follows:

33. Defendant State Farm breached said insurance contract in bad faith without any legitimate and/or arguable basis and/or denied and/or refused to pay the full amount of Plaintiff's claim in bad faith and without any reasonable, legitimate or arguable reason, or any part of it.

34. State Farm further breached said insurance contract in bad faith by intentionally and/or recklessly failing to properly investigate, assess and evaluate Plaintiff's claim for underinsured motorist benefits and/or intentionally and/or recklessly and/or failed to determine the existence of any lawful and/or factual basis to deny Plaintiff's claim.

35. Defendant State Farm has by pattern and practice throughout the State of Alabama and the United States of America engaged in similar wrongful conduct of bad faith with respect to its policy holders of automobile insurance in regards to their uninsured and/or underinsured motorist claims by knowingly and intentionally paying and/or offering to pay their insureds dollar amounts of uninsured and/or underinsured motorist benefits that are less and/or substantially less than their insureds are legally and equitably entitled to and/or knowingly and intentionally refusing to pay to it's insureds the amount(s) of uninsured and/or underinsured motorist benefits that it's insureds are legally and equitably entitled to.

36. In addition, State Farm committed acts of bad faith by:

a. Not honoring its letter of **January 18, 2013** pertaining to additional damages by filing and/or refusing to "continue negotiations" and "to consider any and all new information" that Broadway had provided to State Farm after he filed his first lawsuit.

b. The 2015 continuing damages information and testimony proved that State Farm's original 2012 evaluation was incorrect in numerous ways but State Farm in bad faith still failed to pay Plaintiff's claim, or any additional amount.

c. In August 2015 State Farm in bad faith claimed that it had not had an opportunity to review all of the new medical and damages evidence but had had several months to do so, and has now had almost two (2) years to do so, but has not even adjusted Broadway's secondary claim at all and not even provided Broadway a written response to it.

d. In 2015 Plaintiff proved he incurred more medical and prescription bills and treatment and Defendant refused in bad faith to pay Plaintiff any additional amounts on his underinsured motorist claim without any legitimate reason for not doing so.

e. Plaintiff's doctors provided testimony that Plaintiff's injuries were much more severe than State Farm (in bad faith) concluded they were in 2012, but State Farm from June 26, 2015 to the present date, in bad faith refused to alter or change its original claims evaluation without any basis for not doing so, so as to pay Plaintiff additional money on his UIM claim.

f. Some of the out of pocket and other medical bills produced to Defendant State Farm in 2015 were incurred in 2012 and State Farm in bad faith refused to pay these bills.

g. State Farm in bad faith refused to investigate or evaluate Plaintiff's post January 2013 injury and damage information and testimony produced to State Farm in 2015.

48

h. State Farm in bad faith refused to re-evaluate its December 2012/ January 2013 claims decision evaluation in light of the April 2015 to August 2015 additional/continuing damages information and testimony that proved its original (bad faith) evaluation and position was clearly wrong – in that in 2015 it was proven by Plaintiff Broadway to State Farm that he  (1) did not recover at all from his automobile accident injuries, much less did he "recover satisfactorily"; (2) he had incurred substantially more medical treatment and medical bills which exceeded the amount of unpaid UIM coverage; (3) he did in fact need surgery – a triple level spinal fusion that would render him totally disabled from doing his job as a land surveyor; and (4) his injuries were more serious and more extensive. Despite this new evidence State Farm in bad faith refused to pay Mr. Broadway one single dime.

i. State Farm beginning in late June 2015 and continuing to the present time has refused to reasonably settle with Plaintiff despite being in the possession of a massive amount of <u>additional physical and economic damage information in excess of unpaid policy limits.</u>

37. Plaintiff proved that his post January 2013 damages were fixed in excess of the $20,000.00 of unpaid UIM coverage under *LeFevre v. Westberry*, 590 So. 2d 154 (Ala.1991) standard as he proved **$20,526.00** of additional net actual medical and prescription bills (on top of continuing pain and suffering mental anguish and physical impairment), <u>in excess of his remaining UIM policy limits,</u> but State Farm in bad faith failed and/or refused to pay Plaintiff any additional UIM coverage.

38. State Farm in bad faith failed and/or refused to investigate and/or evaluate Broadway's secondary UIM claim in accordance with its own claim evaluation procedures,

49

policies and adjustment manuals and in bad faith failed to apply certain aspects of those procedures and manuals.

39. State Farm in bad faith failed and/or refused to evaluate Broadway's secondary UIM claim in accordance with Alabama compensatory damages law.

40. State Farm in bad faith has unreasonably delayed in adjusting Broadway's secondary UIM claim and has not ever sent Broadway or his legal counsel any kind of response to his secondary UIM claim.

41. There is no reasonable or legitimate dispute that all and/or most of Broadway's 2013, 2014, and 2015 medical treatment and bills were caused  by the subject motor vehicle accident and State Farm in bad faith has failed and/or refused to pay any additional amount of Broadway's secondary UIM claim.

42. The April to August 2015 productions to Defendant and the medical and personal testimony showed that State Farm's original December 2012 and January 2013 claims evaluation and decision was incorrect in many ways but State Farm in bad faith refused to reassess and reevaluate its original or subsequent claim evaluation in light of said evidence, which was also violative of its own claims procedures, manuals, and standards.

As a proximate cause and/or result of Defendants bad faith breach of contract the Plaintiff was caused injury and damage including but not limited to the loss of the benefit of his bargain, not receiving the full amount of his underinsured motorist coverage, and to experience mental anguish, emotional distress and outrage.

Wherefore premises considered Plaintiff Broadway demands judgment against State Farm for such compensatory and punitive damages as a jury deems just and reasonable but in excess of the jurisdiction of the Federal District Court.

Respectfully submitted this the 15th day of June, 2017.


_____
G. William Gill, (GIL024)
Attorney for the Plaintiff


G. William Gill
Attorney and Counselor at Law
Montgomery, AL 36104
Telephone: 334-834-7606
Facsimile: 334-834-3335
E-mail: attorney.williamgill@knology.net


**PLAINTIFF JOE BROADWAY DEMANDS A TRIAL BY JURY**


_____
G. William Gill

<u>Defendants may be served at the following address:</u>

State Farm Mutual Automobile Insurance Company:
c/o Agent for Service of Process
John Vivona
100 State Farm Parkway
Birmingham, AL 35209-7186